UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

AMAZON.COM, INC.,

             Plaintiff,

   v.

ATTORNEY GENERAL LETITIA JAMES, in
her official capacity as the Attorney General of
the State of New York,

             Defendant.

Case No.  **21-CV-767**

**COMPLAINT**

---

Plaintiff Amazon.com, Inc. ("Amazon" or "Plaintiff"), by and through its undersigned counsel, brings this action for declaratory and injunctive relief from the New York Attorney General's unlawful attempts to subject Amazon—at its JFK8 fulfillment center in Staten Island and DBK1 delivery station in Queens—to state oversight of activities governed by federal law and enforced by federal regulators, and alleges as follows:

## NATURE OF THE CASE

1.    Amazon is an essential business providing much-needed supplies and jobs in its communities. Amazon has been intensely focused on COVID-19 safety, and has taken extraordinary, industry-leading measures grounded in science, above and beyond government guidance and requirements, to protect its associates from COVID-19, earning praise from health and safety officials and law enforcement officers.

2.    In developing its response to the COVID-19 pandemic, Amazon has not only relied on its team of top health and safety professionals but also engaged with over 20 leading global medical and health experts, including pandemic response doctors, epidemiologists, and industrial

1

hygienists, to identify and implement best practices.  Based on guidance from these experts, Amazon has implemented over 150 process changes to promote social distancing, hygiene, and the safety of its associates, often well before New York State officials and federal officials recommended analogous measures.

3.     In order to protect its employees, in March 2020, Amazon expanded its paid and unpaid leave programs in light of the pandemic, required associates to observe social distancing, formalized its contact tracing process, and instituted daily temperature checks of all Amazon associates entering select sites, including its JFK8 fulfillment center in Staten Island, prior to expanding temperature checks to the entire U.S. operations network.  Amazon directed anyone registering a temperature over 100.4 ºF (or lower where required by state or local authorities) to return home and only come back to work after they have gone three days without a fever.  Amazon also staggered shift times, rearranged facilities, break rooms and work stations, and instituted enhanced cleaning protocols.  In April 2020, Amazon distributed face masks to all associates and required that they be worn at all times by anyone in its facilities.  It also began daily disinfectant spraying.  By November 2020, Amazon had even built its own COVID-19 testing capacity and laboratories, and began testing its workforce for asymptomatic cases of COVID-19.

4.     Amazon's efforts far exceed what is required under the law, and, as discussed below, go well beyond measures that the Office of the New York Attorney General ("OAG") has deemed comprehensive.  Following an unannounced inspection of JFK8 on March 30, the New York City Sheriff's Office—which was charged by the Mayor with enforcing COVID-19 safety requirements—stated that "[t]he facility appeared to go above and beyond the current compliance requirements" based on "the facility's temperature screening procedure which is required to enter the facility"; "numerous legible signs explaining the six-foot social distancing policy"; "taped

indicators on the floor to enforce this policy"; "work areas, which had every other desk space shut down so that no employees were within the vicinity of any other employee"; a breakroom that "appeared to be in strict compliance"; and Amazon's "staggering [of] employee shifts to both minimize the amount of staff in the facility at once, and to reduce the amount of staff that was entering and exiting the building at once to further promote social distancing."  The Sheriff's lieutenant who led the inspection concluded that complaints about JFK8 were "completely baseless" and that "there were absolutely no areas of concern."

5.      The data corroborates these independent law enforcement findings—the COVID-19 infection rate among Amazon and Whole Foods Market front-line employees in New York is *half* that of New York's general population.  And this likely materially *understates* the effectiveness of Amazon's health and safety measures because case rates do not distinguish between infections that occurred in the community versus those that were work-related.  As the U.S. Department of Labor Occupational Safety and Health Administration ("OSHA") has recognized, "[g]iven the nature of the disease and ubiquity of community spread . . . in many instances it remains difficult to determine whether a COVID-19 illness is work-related, especially when an employee has experienced potential exposure both in and out of the workplace."[1]

6.      Amazon takes the health and safety of its employees extremely seriously, and it has taken appropriate steps to enforce its health and safety protocols for the protection of its entire workforce.  This is exactly what Amazon did with respect to Christian Smalls and Derrick Palmer, two associates at Amazon's JFK8 facility who committed severe health and safety violations.

---

[1] Patrick J. Kapust, Acting Director, Directorate of Enforcement Programs, *Revised Enforcement Guidance for Recording Cases of Coronavirus Disease 2019 (COVID-19)* (May 19, 2020), https://www.osha.gov/memos/2020-05-19/revised-enforcement-guidance-recording-cases-coronavirus-disease-2019-covid-19.

7. Amazon terminated Mr. Smalls' employment after he repeatedly violated social distancing requirements and an order to quarantine and stay off Amazon property—for which he was paid—due to a potential COVID-19 exposure. Amazon issued a final warning to Mr. Palmer for failing to comply with social distancing requirements.

8. Amazon necessarily took these actions because Mr. Smalls and Mr. Palmer deliberately violated Amazon's health and safety rules and directives and knowingly placed themselves and their co-workers at risk.

9. However, within hours of Mr. Smalls' termination, and before conducting any investigation to ascertain these or any other facts, the New York Attorney General publicly condemned Amazon's termination of Mr. Smalls.

10. The OAG then launched and pursued an investigation of Amazon's COVID-19 response. Less than a month later and based on its cursory investigation to that point, the OAG took the highly unusual step of making a "preliminary assessment" that Amazon had violated safety requirements—including the federal Occupational Safety and Health Act ("OSH Act") and its regulations—in connection with Amazon's response to the COVID-19 pandemic, and that Amazon had unlawfully retaliated against Mr. Smalls and Mr. Palmer. The OAG's letter to Amazon containing the preliminary assessment did not mention the New York City Sheriff's Office's findings that Amazon went "above and beyond" applicable compliance requirements and that complaints to the contrary were "baseless," or include any other facts favorable to Amazon.

11. From the outset of the OAG's investigation, Amazon provided the OAG with extensive information about its extraordinary efforts to protect its associates against COVID-19. Amazon also provided evidence of its compelling safety-related reasons for taking action against Mr. Smalls and Mr. Palmer, including photographs of Mr. Smalls violating Amazon's social

distancing guidelines at the JFK8 facility after Amazon instructed him to quarantine for a potential COVID-19 exposure. The evidence showed that Mr. Smalls not only failed to comply with social distancing requirements, but that, as someone directed to quarantine, he was required to stay off Amazon property—and was paid for doing so—yet he violated those clear requirements by returning to the JFK8 property.

12.     Nevertheless, the OAG refused to give any weight to the substantial amount of detailed information and documents that Amazon provided regarding its comprehensive health and safety program or the New York City Sheriff's Office's reports—information that squarely rebuts the OAG's preliminary assessments. Instead, the OAG continued to claim that Amazon violated health and safety standards and retaliated against Mr. Smalls and Mr. Palmer.

13.     The OAG has now threatened to sue Amazon if it does not immediately agree to a list of demands, many of which have no connection to health and safety and have no factual or legal basis. Among other things, the OAG has demanded that Amazon "disgorge" profits, subsidize public bus service, reduce its production speeds and performance requirements, reinstate Mr. Smalls and pay large sums to Mr. Smalls and Mr. Palmer for "emotional distress," retain a health and safety consultant to oversee safety and production, and adopt safety-related policies it already implemented.

14.     The OAG's exorbitant demands are based on a standard for workplace health and safety far more stringent than the standard adopted by the OAG when defending, in other litigation, the New York State Courts' reasonable but more limited safety response to COVID-19 in the face of threats greater than those present in Amazon's private facilities. The New York State Courts, for example, implemented temperature screening months after Amazon, and, unlike Amazon, has not developed its own testing capacity and provided free tests to its employees. Nevertheless, in

that litigation, the OAG has claimed that the New York State Courts' measures were "a comprehensive regime" that was "reasonable, effective, and necessary in minimizing exposure." State Br. 2, *Quirk v. Difiore*, No. 1:20-cv-5027, ECF No. 23 (S.D.N.Y. Aug. 7, 2020) ("Quirk Opp."). Further, the OAG argued that "no COVID-19 protection regime is or can be perfect," and courts should not rely on "unsupported and inflammatory assertions about safety," "unaccompanied by supporting evidence," and "contradicted by the evidence supplied by the [employer]." *Id.* at 19, 21. Amazon agrees.

15.     More fundamental than applying an inconsistent and incorrect standard, the OAG lacks the legal authority it purports to wield against Amazon. The federal OSH Act preempts the OAG's use of state law to regulate workplace safety, and, as this Court has already held in litigation brought by Mr. Palmer concerning the very subject matter of the OAG's investigation, OSHA has primary jurisdiction over workplace safety claims brought under New York Labor Law Section 200. Moreover, the National Labor Relations Act ("NLRA") preempts the OAG's claims that Amazon retaliated against Mr. Smalls and Mr. Palmer for organizing and participating in protests regarding working conditions at JFK8, and the U.S. National Labor Relations Board ("NLRB") has authority for enforcement of this federal law. Even if the New York Labor Law were not preempted in these circumstances, the Labor Law provisions on which the OAG relies create only a private right of action by the individual who is the victim of the alleged retaliation—and here, Mr. Smalls and Mr. Palmer are already pursuing their own private actions with their own counsel.

16.     Finally, in making its demands, the OAG fails to recognize the significant ways in which Amazon has addressed and continues to address the OAG's purported concerns. Amazon has invested approximately $10 billion on COVID-related initiatives to keep associates safe and deliver essential products to customers, including $800 million in the first half of 2020 alone on

COVID-19 safety measures.  Amazon already voluntarily offered to provide subsidized bus service to the MTA, but the MTA rejected Amazon's offer.  Amazon already modified its production speeds and performance requirements to accommodate COVID-19 safety measures.  And Amazon already retained some of the world's leading experts to inform the company's efforts to address the threat posed by COVID-19.

17.     Amazon cannot accept the OAG's attempt to subject Amazon to an inconsistent and unfair standard for workplace safety that is preempted by federal law and assigned to the primary jurisdiction of federal regulators—especially when the underlying facts show that Amazon has done an exemplary job responding to an unprecedented global pandemic.  Since the start of the OAG's investigation, Amazon has been open and transparent with the OAG about Amazon's response to the COVID-19 pandemic and its actions against Mr. Smalls and Mr. Palmer.  Amazon shared voluminous information with the OAG in a good-faith effort to address the OAG's concerns, even though the OAG lacked jurisdiction to regulate workplace health and safety and employees' concerted activities.  Amazon is proud of the measures it has taken to protect the health and safety of its workers.  But now, the OAG, without jurisdiction, is demanding relief that is not appropriate or warranted and is threatening to publicly sue if Amazon does not submit to the OAG's unreasonable terms.  The OAG's threats and unwarranted demands are not tethered to the facts or the law, and thus Amazon must now seek relief in this Court.

18.     The federal courts have both the jurisdiction and the authority to enjoin the OAG from usurping powers created by federal law and reserved to federal regulators.  "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction . . . to resolve."  *Cable*

*Television Ass'n of N.Y., Inc. v. Finneran*, 954 F.2d 91, 94 (2d Cir. 1992) (quotation marks omitted). This lawsuit therefore seeks a declaration that, as applied to the facts of this case, the state laws that the OAG seeks to enforce are preempted by federal law and an injunction against the OAG's ongoing misuse of those laws against Amazon.

## PARTIES

19.     Plaintiff Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

20.     Defendant Letitia James is the Attorney General of the State of New York. She is sued in her official capacity.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This action arises under the Supremacy Clause of the United States Constitution, the OSH Act, 29 U.S.C. § 651 *et seq.*, the NLRA, 29 U.S.C. § 151 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

22.     Because Amazon "seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute," it has "present[ed] a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *see also Cable Television Ass'n of N.Y., Inc. v. Finneran*, 954 F.2d 91, 93-95 (2d Cir. 1992) (concluding that district court had subject matter jurisdiction over action seeking a declaration that state regulation "was pre-empted by [federal law]" and "an injunction barring the state from enforcing the regulation").

23.     To the extent this action raises questions regarding the New York Labor Law or the New York Workers' Compensation Law, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Amazon's claims occurred in this District.

## STATEMENT OF THE CASE

25.     As the Eastern District of New York has recognized, "[r]egulating in the age of COVID-19 is a dynamic and fact-intensive matter fraught with medical and scientific uncertainty." *Palmer v. Amazon.com, Inc.*, No. 20-cv-2468 (BMC), --- F. Supp. 3d ---, 2020 WL 6388599, at *6 (E.D.N.Y. Nov. 2, 2020).  Because "[t]here is room for significant disagreement as to the necessity or wisdom of any particular workplace policy or practice," "[c]ourt-imposed workplace policies could subject the industry to vastly different, costly regulatory schemes in a time of economic crisis."  *Id.*  As a result, the court has held that "[c]ourts are particularly ill-suited to address this evolving situation" and that it was for OSHA, not the courts, to "strike a balance between maintaining some level of operations in conjunction with some level of protective measures."  *Id.*

26.     With respect to Amazon specifically, the Eastern District of New York recognized that Amazon's "JFK8 [facility] is not the source of COVID-19," and that "[t]he public at large cannot avoid COVID-19 simply by avoiding JFK8, its immediate surrounding area, and its employees."  *Palmer*, 2020 WL 6388599, at *7.  Rather, "the public risks exposing themselves to COVID-19 nearly anywhere in this country and the world."  *Id.*

27.     Despite this clear precedent regarding the nature of the threat posed by COVID-19 and the primary role of federal regulators in combatting this threat, the OAG seeks to penalize Amazon—without a legal or factual basis—based on an alleged failure to meet a standard for

workplace health and safety that OAG does not even use when evaluating New York State's own response to the COVID-19 pandemic.

### A. Amazon Has Taken Above-And-Beyond Measures To Protect Associates In Response To COVID-19.

*Amazon Quickly And Proactively Committed Substantial Resources To Developing And Implementing Extensive Health And Safety Measures Based On Guidance From Experts.*

28.     Amazon is an essential business whose continued operation during the COVID-19 pandemic is critical to allowing New Yorkers and others to obtain the necessities to sustain their lives, protect their health, and adhere to stay-at-home guidelines.  Amazon also provides much-needed employment to many people in its communities.

29.     Amazon strives to protect its associates as they continue providing a critical service to their fellow Americans.  In order to do so effectively, Amazon quickly adjusted its processes and procedures, and designed and implemented numerous new processes and procedures, to respond to the novel and evolving threat of COVID-19.

30.     Amazon's health and safety effort has been grounded in science and led by top health and safety professionals who oversee a 5,000-member global safety team.

31.     Since the onset of the COVID-19 pandemic, Amazon's team of experts has consulted with, reached out to, and been guided by global and national groups, such as the World Health Organization ("WHO") and the Centers for Disease Control and Prevention ("CDC"), as well as state and local health departments in order to implement Amazon's workplace pandemic response as quickly as possible and to develop and implement best in class policies and procedures.

32.     In addition, Amazon has engaged over 20 of the foremost global medical experts (including pandemic response doctors, epidemiologists, and industrial hygienists) to assist in identifying and implementing appropriate measures to protect its associates, well exceeding government health guidelines and requirements.

33.     Amazon also retained experts on industrial hygiene.  Through this engagement, Amazon received advice, consultations, and feedback on multiple health and safety initiatives including temperature screening checks, mask usage, its disinfectant spraying program, and its COVID-19 testing program for all associates.

34.     These experts have provided ongoing guidance and information regarding transmission risk; confirmed case management; contact tracing, cleaning and disinfecting programs; temperature verification and symptom screening; and testing.  They have informed Amazon's communications to associates regarding COVID-19; completed toxicology reviews of select cleaning and disinfecting products in order to limit any risk to associates' health posed by Amazon's enhanced cleaning measures; and provided additional on-the-ground support as Amazon implements or adjusts health and safety measures in response to new guidelines and best practices.

35.     Based on guidance from these experts and authorities, as discussed further below, Amazon implemented over 150 significant process changes at its facilities in order to enhance workplace health and safety.

36.     Amazon proactively implemented these extensive health and safety measures against the background of ever-changing medical guidance and evolving understandings of how COVID-19 was spread.

37.     Amazon has invested approximately $10 billion on COVID-related initiatives aimed at keeping associates safe and deliver essential products to customers.  This includes spending more than $800 million in the first half of 2020 alone on COVID-19 safety measures, including:

- Providing more than 100 million masks to Amazon's associates at distribution sites;

- Adding 2,298 handwashing stations;

- Adding more than 5,750 janitorial team members;

- Providing an additional 34 million gloves;

- Adding 48 million ounces of hand sanitizer;

- Adding 93 million sanitizing sprays and wipes;

- Installing more than 1,100 thermal cameras; and

- Building scalable capacity to test for coronavirus.

38.     In short, Amazon has been a global leader in workplace safety during this unprecedented pandemic, following the guidance and advice of public health experts and organizations early on and investing in protecting the health of its associates.

***Amazon Took Early Action To Increase The Frequency And Scope Of Its Cleaning Processes To Protect Its Associates From The Emerging Threat Of COVID-19.***

39.     Even before the COVID-19 pandemic, Amazon had in place extensive cleaning procedures at its facilities to ensure a safe and sanitary workplace.  In December 2019, Amazon implemented new cleaning procedures at all of its sites, including JFK8 and DBK1, pursuant to which Amazon regularly disinfected all door handles, handrails, lockers, and other "high touch" surfaces.  Amazon later increased and supplemented these cleaning procedures in response to COVID-19.

40.     Starting on or about March 2, 2020, Amazon added almost 200 high-contact surfaces to its regular cleaning and disinfection protocols and has significantly increased the frequency at which breakroom and restroom surfaces are cleaned so that they are cleaned six to eight times per shift, which is approximately every 75 minutes.  In order to implement these enhanced cleaning and disinfection protocols, Amazon also significantly increased the size of the janitorial teams that clean its sites.

41.     On March 5, when the COVID-19 threat began to emerge, Amazon began conducting janitorial audits at each site to ensure that the enhanced cleaning and disinfection protocols are being properly implemented.  The individual performing the audit must complete a checklist with more than 30 prompts to confirm compliance with various aspects of the enhanced cleaning protocol, and at least one janitorial audit is performed per each shift.

42.     Amazon's JFK8 fulfillment center on Staten Island—the facility on which the OAG has centered its purported investigation of Amazon's response to the COVID-19 pandemic— illustrates the extensive lengths to which Amazon has gone to ensure its facilities are clean.

43.     JFK8 is an 857,388 square foot facility—the size of more than 15 football fields— and more than 5,000 Amazon associates work there.  In addition to the warehouse space on the ground floor, there are three additional floors within the facility where associates ship and receive hundreds of thousands of products each day.  JFK8 has a total of 1,003 separate physical stations where associates work.

44.     At JFK8, Amazon tripled the size of its cleaning teams in order to implement these enhanced cleaning protocols and to enable the teams to cover the 200 additional points of contact that are now regularly sanitized.

45.     On April 6, as part of a pilot program at JFK8, Amazon also adopted disinfectant spraying (also referred to as "misting"), which is a deep cleaning practice commonly used by hospitals and airlines.  This disinfectant spraying process effectively coats the entire surface of the area being treated with disinfectant, including around any curves or bends in handles, and disinfects difficult-to-clean surfaces around the facility.

46.     On April 27, Amazon began daily disinfectant spraying throughout the entire JFK8 facility.  An Amazon-approved third-party vendor applies the disinfectant spray to sanitize all

areas of the facility (including stairways, breakrooms, and all associate workstations) and all equipment (including totes, pallet jacks, and carts) every 24 hours.

***Amazon Implemented Routine Temperature Checks In Advance Of Guidance From The CDC To Quickly Identify And Address Potential Occurrences Of COVID-19.***

47. On March 29, Amazon began on-site temperature checks at select sites around the United States, including JFK8, in an effort to ensure that associates and support staff do not have an elevated temperature—one of the primary COVID-19 indicators that can be objectively measured—when they arrive at work.  This program complemented other measures mandating that associates stay home if they are not feeling well, including signs posted at entrances directing

associates not to enter the facility and to go home if, among other things, they are experiencing symptoms like coughing or shortness of breath:

# Do not enter if:



 You are living with someone who has COVID-19 and have medical advice not to be at work.

 You have a temperature of 100.4°F (38°C) or higher.

 You are in a 14-day period of self-isolation directed by a healthcare provider or health official.

 You have travelled to another country in the last 14 days.

 You currently have a cough, or shortness of breath.

## Here's what to do:

- Do not enter. Move away from the entrance area and go home.

- Contact the ERC , or your HR team, DSP, or support team to notify them of the situation.

**If you need medical assistance,** let your medical provider know you have or may have COVID-19 before you arrive.

48.    Amazon subsequently expanded this temperature screening program to its entire U.S. operations network, including DBK1, and Amazon began checking the temperatures of hundreds of thousands of individuals each day.  By April 30, 2020, Amazon had purchased more than 1,000 thermal cameras and 31,000 thermometers to conduct these temperature checks.

49.    Under the temperature screening program, anyone registering a temperature over 100.4 ºF (or lower where required by state or local authorities) is directed to return home and only come back to work after they have gone three days without a fever, in line with CDC recommendations.

50.     Amazon established this program more than a week before the CDC issued guidance recommending temperature checks as one condition for permitting critical infrastructure workers to continue work following a potential exposure to COVID-19.  Even then, the CDC did not go so far as to recommend checks for all individuals regardless of known exposure.[2]  Indeed, the CDC still states that "[s]creening employees is an optional strategy that employers may use."[3]  Similarly, although New York requires that employers "screen" employees, "[w]orkplaces are not required to check employee temperatures."[4]  This is one of many examples of Amazon's COVID-19 safety measures that go "above and beyond" any government requirements or guidance.

***Amazon Modified Its Leave Policies In Advance Of Changes To New York State Law In Order To Allow Associates To Focus On Their Health And Families.***

51.     On March 6, 2020, Amazon temporarily modified its unpaid time off policy to provide associates with unlimited unpaid time off to ease pandemic-related burdens such as school closures, short absences, or other exigencies.  While Amazon has now returned to its ordinary unpaid time off program, it continues to offer many other forms of paid and unpaid leave for associates.

52.     On March 11, Amazon also established a COVID-19 paid leave program through which associates placed into quarantine or diagnosed with COVID-19 receive up to two weeks of

---

[2] CDC, *Interim Guidance for Implementing Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19* (Apr. 8, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/critical-workers-implementing-safety-practices.pdf.

[3] CDC, *FAQs for Workplaces & Businesses (Should we be screening employees for COVID-19 symptoms (such as temperature checks?))* (Feb. 1, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/general-business-faq.html.

[4] NYC311, *Coronavirus (COVD-19) Worker Symptoms Screening (Temperature Checks)*, https://portal.311.nyc.gov/article/?kanumber=KA-03314; *see also* N.Y. Exec. Order 202.38 ("[C]ommercial building owners . . . shall have the discretion to require individuals to undergo temperature checks prior to being allowed admittance.").

additional paid time off so they can focus on their health and not lost income.  This COVID-related paid time off does not count against the associates' paid and unpaid time-off accruals.

53.     Amazon asks these associates to stay away from their work site, to watch for symptoms, and to seek medical attention if they experience any symptoms.  Members of Amazon's Human Resources Department will check on the associate's wellness during this quarantine period.

54.     Amazon established this program seven days before New York Governor Andrew Cuomo signed emergency legislation requiring employers with more than 100 employees to provide paid sick leave to employees who need to take leave because they are under a mandatory or precautionary order of quarantine or isolation due to COVID-19.[5]

***Amazon Developed A Contact Tracing Process That Goes Above And Beyond Regulators' Expectations Of Employers.***

55.     Amazon began contact tracing in February 2020, and, on March 20, Amazon formalized its contact tracing process.

56.     Under its current policy, for each confirmed or presumptive case that meets certain criteria, Amazon uses interviews and/or video review to identify who at Amazon may have had "close contact" with the diagnosed individual.  Associates identified as a close contact are directed to remain home from work for 14 days from the last date of exposure (or a longer period if directed by a Local Health Authority ("LHA")).  This policy is consistent with CDC guidance, which states that "[q]uarantine is used to keep someone who might have been exposed to COVID-19 away from others."

57.     Associates directed to quarantine in this manner receive special pay, with full-time associates receiving 80 hours of base pay.

---

[5] *See* New York State, *Paid Sick Leave for COVID-19 Impacted New Yorkers*, https://www.governor.ny.gov/programs/paid-sick-leave-covid-19-impacted-new-yorkers.

58.     Following confirmation of a positive COVID-19 diagnosis, Amazon notifies all associates at the site of the diagnosis either through text or other electronic notifications, or through small-group, in-person discussions with management that comply with social distancing guidelines.

59.     As the CDC explains, "[h]ealth departments are responsible for leading case investigations, contact tracing, and outbreak investigations."  It is "not typical" for health departments to "rely on the employer to identify workplace contacts."[6]  Guidance from New York State and New York City similarly makes clear that LHAs are primarily responsible for contact tracing.

60.     In other words, Amazon's decision to conduct contact tracing is going above and beyond what is required and benefits all New Yorkers, especially given that in the initial months of the pandemic LHAs were not set up to handle contact tracing and lacked the necessary resources to do so.

***Amazon Took Extensive Steps To Facilitate Social Distancing Before The Social Distancing Requirements In New York Governor Cuomo's PAUSE Executive Order Took Effect.***

61.     On March 17, Amazon implemented a three-foot social distancing policy based on then-current guidance from the WHO.[7]  The policy required all associates to maintain at least three

---

[6] CDC, *Case Investigation and Contact Tracing in Non-healthcare Workplaces: Information for Employers* (Oct. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/contact-tracing-nonhealthcare-workplaces.html.

[7] World Health Organization, *Coronavirus Disease (COVID-19) Advice for the Public*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public ("Maintain at least a 1-metre distance between yourself and others.").

feet of distance from each other at all times. Amazon changed this policy to require six feet of social distancing on March 20.

62.     Amazon implemented its six-foot social distancing policy two days before Governor Cuomo's PAUSE executive order became effective and required "[b]usinesses and entities that provide other essential services [to] implement rules that help facilitate social distancing of at least six feet."[8]

63.     From March 15 to March 22, Amazon implemented a series of additional measures designed to facilitate social distancing at JFK8. These measures included:

a.  Temporarily suspending its exit screening policy to allow associates to leave JFK8 without undergoing screening;

b.  Eliminating all in-person stand-up meetings, during which associates and supervisors address safety tips, success stories, and other information, and replacing these meetings with other methods of communication, such as mobile applications, broadcasts to associate workstations, and emails;

c.  Expanding and modifying break areas and posting notices to facilitate compliance;

d.  Extending regular break times from 15 minutes to 20 minutes to ensure that associates have sufficient time to wash their hands and to clean their workstations;

e.  Staggering the start times of associates' shifts by 15-minute intervals in order to reduce the number of associates entering the facility at the same time;

---

[8] *See* Gov. Andrew Cuomo, *Governor Cuomo Issues Guidance on Essential Services Under The 'New York State on PAUSE' Executive Order* (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order.

    f.   Posting six-foot visual indicators at locations around the building, including time clocks, desks, and security turnstiles; and

    g.   Modifying its new-hire orientation, onboarding, and first-day processes to facilitate social distancing.

64.    Amazon made several other changes to JFK8's layout to further facilitate social distancing, including:

    a.   Shutting down every other workstation in the packing department;

    b.   Adding 17 satellite breakrooms in addition to the five permanent break areas;

    c.   Removing breakroom furniture to ensure that all seats are six feet apart and adding barriers to separate microwave ovens;

    d.   Fastening chairs to tables so no more than two people could sit at any single six-foot breakroom table;

    e.   Creating three additional exits to minimize crowding at the exits at the end of shifts;

    f.   Converting certain areas of JFK8 into one-way walking paths to reduce crowding; and

    g.   Installing dividers in each of the 38 bathrooms at JFK8.

65.    At DBK1, Amazon similarly canceled stand up meetings, redesigned its breakroom, locker room, and offices and added taped locations to indicate six-foot spacing. The site also designated social distancing "champions" who were focused on enforcing social distancing. The champions would circulate through the facility with a six-foot-wide visual indicator to make sure people were standing six feet away from each other.

66.    On April 9, Amazon's "A to Z Web Punch" feature went live at all U.S. Amazon Operations businesses. This mobile application permits associates to clock in and out on their cell phones in order to prevent queuing at time clocks.

67.     On April 17, Amazon announced staggered break schedules to minimize crowding of shared spaces such as breakrooms and time clocks.

68.     An extensive campaign to educate associates regarding social distancing was implemented in parallel with these measures.  Amazon created educational materials for associates in more than 20 different languages.  In fulfillment centers like JFK8, Amazon has posted directional and spatial signage and markings throughout the fulfillment center to further provide guidance and ensure adherence to social distancing requirements.  Amazon also designated site leaders who are dedicated to promoting social distancing throughout the site in order to convey the importance of and Amazon's commitment to social distancing.

69.     In order to enforce social distancing, Amazon clearly communicates its expectations regarding social distancing to associates through multiple means.  These communications initially included direct, verbal instructions from managers, and eventually also included posters and signs throughout the facility stating that failure to maintain social distancing "will result in disciplinary action":



## Social Distancing is **Required**

in all locations within the building including break and prayer rooms, and other high traffic areas.

- **2m/6ft is _required_**
- **Do not move chairs and tables**
- **Compliance will be enforced**

**Must Read:
Social Distancing Violations**

**Violations of social distancing,** as advised by the CDC
and Amazon leadership, underline will result in disciplinary action.

**Social distancing is expected to be adhered to** both inside
and outside of Amazon facilities to ensure the health of
its employees.

**You have the responsibility to report violations**
and immediately notify a member of leadership or HR.
If you see something, say something.

70.     Amazon has also worked to develop cutting-edge machine learning tools to enhance
and further direct the company's social distancing efforts.  For example, Amazon launched its
Proxemics initiative, which uses artificial intelligence to analyze camera footage in Amazon's
buildings and to identify images showing individuals who are too close to one another.  Data from
the Proxemics Initiative has helped Amazon identify locations where there are additional
opportunities to facilitate social distancing, such as installing additional plastic barriers between
workstations or adjusting walking lines marked in tape.  Amazon has successfully used data from
the Proxemics initiative at JFK8.

*Amazon Began Distributing Face Masks In Advance Of New York State Requirements And
Imposed More Stringent Rules Regarding Use Of Face Coverings Than New York State.*

71.     On April 5, Amazon began distributing face masks to all associates at JFK8.

72.     Beginning on April 15, Amazon required a face mask or face covering to be worn
by anyone entering Amazon facilities, including JFK8 and DBK1, and by all associates and
partners throughout their shift, including those on the road.

73.     Amazon took these steps with respect to face masks or face coverings in advance
of New York State Governor Andrew Cuomo's executive orders:

22

| Amazon's Protective Measures | New York State Executive Orders |
|---|---|
| April 5 – Amazon begins distributing face masks to all associates at JFK8. | April 12 – Governor Cuomo directs essential businesses to "provide[] . . . face coverings" to employees "in direct contact with customers or members of the public." N.Y. Exec. Order 202.16. |
| April 15 - Amazon requires everyone entering Amazon Operations locations as well as all employees and partners throughout their shift, including those on the road, to wear face masks or face coverings. | April 17 – Governor Cuomo requires individuals "to cover their nose and mouth with a mask or cloth face-covering when in a public place and unable to maintain, or when not maintaining, social distance." N.Y. Exec. Order 202.17. |

74.     Amazon's policies and procedures also afforded its associates greater protections than those set forth in the Executive Orders because they required face coverings to be worn at all times even when social distancing could be, and was, maintained.

75.     Amazon currently distributes thousands of medical masks (which include instructions for use) to associates daily and also distributes two reusable cloth masks to each associate every 30 days. Any associate who needs a mask has access to one free of charge at all relevant times. Amazon allows associates to take additional masks home for their families.

76.     Amazon reviews the supply of masks and gloves on site daily to ensure that there is at least a 10-day supply on hand at JFK8.

77.     Since April 5, Amazon has maintained a constant and abundant supply of face masks on site at JFK8. In fact, at one point, Amazon had a supply of more than one million face masks at JFK8. JFK8 donated surplus masks to New York City law enforcement officers who did not have adequate supplies.

78.     In addition, Amazon instructs all associates to immediately notify management if gloves and masks are unavailable or supplies are close to running out on the floor so Amazon can restock them.

***Amazon Provided Associates Hand Sanitizer And Cleaning Supplies To Protect Against COVID-19.***

79.     On February 29, 2020, Amazon posted signs throughout JFK8 encouraging all associates to wash their hands with soap and water for at least 20 seconds, and if soap and water is not readily available, to use hand sanitizer with at least 60% alcohol content:



80.     JFK8, like all Amazon facilities, has hand sanitizer available for associates at each turnstile at all entrances and exits to the facility, and there are signs posted at the turnstiles directing associates to sanitize their hands as they pass through.  In addition, Amazon has installed over 100 hand-sanitizing stations throughout JFK8 to ensure that associates can quickly and efficiently clean their hands.

81.     Amazon refills the hand-sanitizing stations at JFK8 on a regular basis.   The procurement team checks all of the hand-sanitizing dispensers in the facility and if any dispensers are running low or are empty, the procurement team arranges for those dispensers to be promptly refilled.

82.     In addition, in response to the COVID-19 pandemic, Amazon has installed over 450 "Sanitation Stations" that contain cleaning supplies, such as disinfecting wipes and bottles of disinfectant spray, throughout JFK8.

83.     There are two types of sanitation stations:

   a. Six-foot tables stocked with cleaning supplies (including heavy-duty sanitizing wipes, bottles of disinfectant spray, and paper towels) for all associates to take and use.   These larger Sanitation Stations are strategically located throughout the facility to ensure that associates can easily and quickly access the cleaning supplies they need while they are working.

   b. Smaller stations including, for example, containers of cleaning supplies attached to individual workstations.

84.     Associates are encouraged to take as many disinfecting wipes and cleaning supplies as they need:



85.     Amazon regularly audits its stock of cleaning supplies and hand sanitizer to make

sure sufficient supplies are on site at JFK8.  Amazon's procurement team conducts two "Sanitation

Supply" audits per 10-hour shift.

86.     Amazon's procurement team also does a daily count of the number of disinfecting

wipes and other cleaning supplies at JFK8.  Under Amazon's sanitation supply procedures, the

procurement team is notified if the stock of wipes or hand sanitizer at JFK8 drops below 10 days

of supply on hand to ensure that associates have access to the supplies that they need.

***Amazon Modified Its Procedures For Measuring Productivity To Account For The Time Needed To Adhere To Amazon's Health And Safety Measures.***

87.     On March 18, Amazon ceased providing feedback to associates based on their productivity rates, as measured by the units per hour that the associate processed, and ceased taking any action against employees as a result of extremely low productivity rates.

88.     On April 29, Amazon indefinitely extended the cessation of productivity rate feedback to associates and stopped taking any action against employees as a result of extremely low productivity rates.

89.     Amazon provided talking points to managers so that they could communicate these changes to associates.

90.     In addition, on July 13, JFK8's general manager sent an email to all JFK8 associates reaffirming that Amazon "temporarily suspended [its] productivity feedback and provided additional time during breaks so that associates can maintain a safe environment through social distancing, hand washing, sanitizing work stations, and using the restroom."

91.     On July 13, Amazon also displayed a poster at JFK8 with the same message regarding productivity feedback as the email from JFK8's general manager.

92.     Amazon suspended this part of its performance management process in order to determine what, if any, changes were needed in light of COVID-19.  In October 2020, Amazon implemented revised measures that take into account the amount of time necessary to engage in the health and safety practices that Amazon has put in place since the onset of the pandemic.

93.     Amazon's productivity goal is now based on JFK8 associates' average productivity performance during the month of September—when productivity goals were suspended—and allows enough time for associates to wash their hands, clean their stations, and maintain social distancing.  Further, Amazon continued its longstanding policy that the time spent by associates

27

using the bathroom and washing their hands would not count as time spent off an assigned task. Amazon also reduced the number of associates even eligible for feedback based on productivity to the bottom three percent of performers. This revised policy reflects a reasonable COVID-19-era productivity goal that allows associates to prioritize safety.

***Amazon Developed Its COVID-19 Testing Capacity And Regularly Tests Associates For COVID-19.***

94.     In addition to the other safety measures described above, Amazon initiated a testing program for its associates to further enhance workplace safety.

95.     When it became clear in March 2020 that testing Amazon associates for COVID-19 was going to be of critical importance, Amazon assembled a multidisciplinary task force—ranging from research scientists and program managers to procurement specialists and software engineers—and reassigned them from their normal positions within Amazon so that they could focus on this initiative.

96.     Amazon also hired dozens of lab technicians to build a world-class laboratory team. In October 2020, Amazon launched its testing program, quickly ramping up to conduct tens of thousands of tests each day across 650 sites, including JFK8, as part of its effort to keep Amazon's associates safe.

97.     Amazon invested hundreds of millions of dollars in this initiative to build this testing capacity internally. This means that not only are Amazon associates provided tests free of charge, but the company is adding to the total number of tests available—not taking supply from others.

98.     Amazon now tests more than 700 employees every hour, and Amazon's COVID-19 labs have processed more than one million tests globally.

99.     At the JFK8 facility alone, during a single week in mid-December, Amazon conducted 461 self-administered PCR tests.  By mid-December, the JFK8 facility alone was approaching 2,000 total tests administered.

100.    At the JFK8 facility, testing is available to all Amazon associates every day except Saturday, and there is a registered nurse onsite, as well as videos and visuals, to guide associates in self-administration.  Amazon is working to add testing capacity on Saturday, as well as testing for contractors such as security guards and janitors.  Since instituting testing, the JFK8 facility has never faced a shortage of tests and has been able to provide any associate with a test who wanted one.

101.    Associates are paid for time spent on testing.  Taking time to get tested does not count towards productivity, and associates do not need to schedule testing during their breaks.

102.    Amazon publicizes its free testing resources throughout the JFK8 facility and encourages associates to get tested at least every two weeks.  Associates are reminded of the testing resources at the facility on a daily basis through the electronic communications they receive when they log into their shifts.

103.    As a result of Amazon's testing capacity, Amazon has the ability to identify even asymptomatic cases of COVID-19, which, in conjunction with Amazon's contact trace and quarantine procedures and paid leave program, further reduces the risk of COVID-19 spreading through Amazon's facilities.

104.    Amazon also has a partnership with Grand Rounds, which is a third-party medical provider that offers telehealth services.  Amazon associates can receive telehealth consultations from Grand Rounds at no cost, and Grand Rounds' medical staff is available 24/7 to provide associates with up-to-the-minute support.

105.    As an additional resource, Amazon launched a program in December 2020 which connects associates experiencing COVID-19 symptoms with free offsite COVID-19 testing options.

106.    In addition to testing, Amazon is working to ensure that its front-line associates receive vaccines as soon as possible by advocating on behalf of its associates and working in partnership with global medical experts, governments, and health providers to accelerate vaccination programs.

107.    On January 20, 2021, Dave Clark, the CEO of Amazon's Worldwide Consumer business, wrote to President Biden noting the important role Amazon associates "played to help customers stay safe and receive important products and services at home" and requesting that the "essential employees working at Amazon fulfillment centers, AWS data centers, and Whole Foods Market stores across the country who cannot work from home . . . receive the COVID-19 vaccine at the earliest appropriate time."[9]

108.    Mr. Clark also informed President Biden that Amazon was "prepared to leverage [its] operations, information technology, and communications capabilities and expertise to assist [the Biden] administration's vaccination efforts."   Amazon has an agreement in place with a licensed third-party occupational health care provider to administer vaccines on-site at its Amazon facilities and is prepared to move quickly once vaccines are available.[10]

---

[9] Dave Clark, *Amazon Congratulates President Biden and Vice President Harris; Lends Support to Vaccinating Americans* (Jan. 20, 2021), https://www.aboutamazon.com/news/policy-news-views/amazon-congratulates-president-biden-and-vice-president-harris-lends-support-to-vaccinating-americans.

[10] *Id.*

109.    Mr. Clark's January 20 letter to President Biden followed an earlier letter to the CDC's Advisory Committee on Immunization Practices with a similar request that the CDC "prioritize . . . essential workers who cannot work from home, like those working at Amazon fulfillment centers, AWS data centers, and Whole Foods Market stores, to receive the COVID-19 vaccine at the earliest appropriate time."[11]

***Amazon Constantly Communicates Health And Safety Protocols.***

110.    Amazon communicates new policies and process changes implemented in response to COVID-19 to JFK8's associates through a variety of means, including text message updates, emails, Amazon's "A to Z" mobile application, posters, bulletin boards, and scrolling messages on TVs throughout the facility.

111.    Amazon's Workplace Health and Safety team at JFK8 has also conducted thousands of socially-distanced one-on-one engagements with associates about Amazon's health and safety policies, such as reminding associates of Amazon's policy requiring all associates to wear face masks or face coverings and encouraging associates to clock in and out via Amazon's "A to Z" mobile application in order to minimize crowding at time clocks.  The same team has also conducted over 2,000 socially-distanced individual meetings with new associates at JFK8 in which it explained Amazon's health and safety policies.

112.    In addition, since mid-April, JFK8's general manager has sent a weekly email, called "inSITES," to all JFK8 associates that provides updates about the site's health and safety efforts.  Each weekly inSITES email describes specific safety actions that JFK8 has taken in the

---

[11] Dave Clark, Letter to Dr. Jose R. Romero, Chairman, Advisory Committee on Immunization Practices, *COVID-19 Vaccine Prioritization, Distribution and Administration*, Docket No. CDC-2020-0124                                              (Dec.                              16,                              2020), https://assets.aboutamazon.com/fd/38/180064794afc9ff02c157ac68e0d/acip-letter-12.16.2020.pdf.

past week, provides COVID-19 safety tips and reminders, and shares success stories of associates and managers from the previous week.

113.    Amazon also distributes recorded video messages to JFK8 associates explaining, for example, how to navigate the facility under new policy changes and social distancing requirements.   These video messages are distributed to associates through Amazon's internal broadcast platform.

***Amazon's Robust Health And Safety Measures Have Been Effective In Protecting Its Associates From The Threat Of COVID-19.***

114.    On October 1, 2020, Amazon publicly released a state-by-state comparison of the COVID-19 infection rate among Amazon and Whole Foods Market associates to the infection rate of the general population.  This release was part of Amazon's efforts to maintain transparency and inform associates and the communities in which Amazon operates about how COVID-19 affects its workforce.

115.    Amazon took this step even though case rates, standing alone, are not a useful indicator of the efficacy of the health and safety measures Amazon has implemented in response to COVID-19.  This is because case rates, when reviewed in isolation, do not distinguish between infections that occurred in the community versus those that were work-related, and, obviously, a positive test does not mean someone became infected as a result of their employment with Amazon.

116.    Even with these caveats, the data showed that only 1.15% of Amazon's and Whole Foods Market's front-line employees in New York had tested positive or been presumed positive for COVID-19—a rate that was 50% less than the rate for New York's general population at the time.  This comparison, which is just one of many measures of Amazon's record of success, likely understates the case rates of Amazon associates relative to New York's general population because

not everyone in the general population is screened for symptoms or tested, meaning that the actual COVID-19 rate for New York is likely more than double the rate among Amazon's front-line employees.  Accordingly, the infection rate among Amazon's front-line employees during the OAG's investigation—and the statewide data available at the time the OAG threatened to sue—show that the actual rate of infection among Amazon's front-line employees is likely less than half the rate for New York.  (This data also suggests that any JFK8 associates who contracted COVID-19 likely were exposed outside of JFK8, and not in the workplace.)

117.   The infection rate among Amazon's front-line employees during the OAG's investigation not only compares favorably to the rate among New York's general population, but also to the rate among other frontline workers in New York.  In May 2020, COVID-19 antibody testing showed the following rates among frontline workers in New York:[12]

| Occupation | Percent Positive |
|---|---|
| Downstate Transit Workers | 14.2% |
| Downstate Healthcare Workers | 12.2% |
| NYPD | 10.5% |
| FDNY/EMT | 17.1% |
| Department of Corrections Employees | 7.5% |
| State Police | 3.1% |

118.   Amazon publicly shared the COVID-19 infection rates among its front-line employees not only as part of its commitment to transparency with associates, but also because sharing detailed findings and case rates helps everyone.  Wide availability of data would allow companies, governments, and non-governmental organizations to benchmark progress and share best practices across businesses and industries.  Amazon led the way in this effort to promote

---

[12] *NY Frontline Workers Test Positive for Antibodies at Lower Rates Than Rest of State*, NBC (May 13, 2020), https://www.nbcnewyork.com/news/coronavirus/cuomo-ny-frontline-workers-test-positive-for-covid-antibodies-at-lower-rate-than-rest-of-state/2415595/.

transparency and pool information for the greater good, but, unfortunately, few employers have followed suit.

119.    On March 31, Mayor Bill DeBlasio announced that the "[New York City] [S]heriff's [O]ffice is . . . investigating [entities in New York City] to ensure social distancing is observed" and "[t]here WILL be penalties for any violations."[13]

120.    In March and April 2020, the New York City Sheriff's Office conducted multiple inspections—the first unannounced—of the JFK8 facility to assess the facility's compliance with health and safety.  Three sworn Sheriff's Deputies, led by a Sheriff's lieutenant, inspected the facility.  Following the inspections, the New York City Sheriff's Office concluded that JFK8 "appeared to go above and beyond the current compliance requirements."  In fact, during the tour, the lieutenant in charge of the detail conducting the inspection stated that of all the businesses he had inspected, he had not seen another business put such thorough measures in place to promote social distancing.

**B.  The OAG's Defense Of New York State's Response To COVID-19 In *Quirk* Demonstrates That Amazon's Response Is "Comprehensive," "Reasonable" and "Effective."**

121.    Despite all of the innovative and proactive measures described above that Amazon has taken to protect its associates, which far exceed the mandatory requirements, the OAG has threatened to bring an enforcement action against Amazon for its COVID-19 response.  In criticizing Amazon's COVID-19 response, however, the OAG applies a more stringent standard than when defending the State's own response to COVID-19.

---

[13] New York City Mayor Bill de Blasio (@NYCMayor), Twitter (Mar. 31, 2020, 5:15 PM), https://twitter.com/NYCMayor/status/1245097384985714691?s=20.

122.    In *Quirk v. Difiore*, the union representing more than 1,500 New York court officers filed a putative class action suit against New York Chief Judge Janet DiFiore and New York's Office of Court Administration, asserting, among other things, that the defendants failed to properly sterilize the officers' work environments, provide sufficient protective equipment, and establish safety measures, causing some union members to contract COVID-19 and putting others at risk of infection.  Unlike JFK8 and DBK1, which are closed to the public, the New York court officers work at facilities where they are required to have close contact with the public, putting them at greater risk than Amazon associates.  The state defendants are represented by the OAG in this lawsuit.

123.    The *Quirk* plaintiffs moved for a temporary restraining order or a preliminary injunction, and the OAG opposed the motion.  In its opposition brief, the OAG defended the health and safety measures the New York State Courts put in place, and stated that "COVID-19 is a threat to each and every New Yorker"—it is "not a special injury unique" to certain workers.  State Br. 19, *Quirk v. Difiore*, No. 1:20-cv-5027 (S.D.N.Y. Aug. 7, 2020), ECF No. 23 ("Quirk Opp.").

124.    In recognition of the pervasive threat that COVID-19 poses, the OAG stated that "no COVID-19 protection system is fully guaranteed to protect against the virus" and that "no COVID-19 protection regime is or can be perfect."  Quirk Opp. at 2, 19.

125.    The OAG nonetheless defended the New York State Courts' measures to address COVID-19 as "a comprehensive regime" that was "reasonable, effective, and necessary in minimizing exposure."  Quirk Opp. at 2.

126.    Amazon has adopted similar and, in many cases, more extensive protective measures than those measures the OAG acknowledges were "comprehensive," "reasonable,

effective, and necessary" when adopted by the New York State Courts in a more dangerous public

environment:

| New York State Courts' Measure | Amazon's Analogous Measures |
|---|---|
| Beginning July 6, New York State ("NYS") Courts required visitors to submit to temperature screening and questioning upon entry into a facility. Beginning July 15, NYS Courts expanded screening and questioning to judges and non-judicial personnel. If an individual had a temperature greater than 100.0 °F or answered "yes" to a screening question, court personnel instructed that individual to leave the facility immediately. | On March 2, Amazon closed JFK8 to the public. On March 29, Amazon began conducting daily on-site temperature checks at JFK8 to verify that associates do not have an elevated temperature when they arrive at the facility.<br><br>These actions supplement other measures requiring associates to stay home and not come to work if they are feeling sick, including work rules and signs at the entrances of Amazon's facilities requiring associates to go home if, among other things, they are experiencing symptoms like coughing or shortness of breath. |
| On or before May 15, 2020, NYS Courts required all judges and non-judicial personnel to wear a face mask or covering except when in a closed private office. | Beginning April 15, Amazon required anyone entering its fulfillment centers to wear a face mask or face covering at all times they are inside the facility—not just in designated areas or when social distancing is not possible. |
| On May 29, NYS Courts "strongly encouraged" use of hand sanitizer. | On February 29, Amazon posted signs throughout JFK8 encouraging all associates to wash their hands with soap and water for at least twenty seconds, and if soap and water is not readily available, to use hand sanitizer with at least 60% alcohol content.<br><br>Since April 17, all Amazon facilities have hand sanitizer available for associates at each turnstile at all entrances and exits to the facility, and there are signs posted at the turnstiles directing associates to sanitize their hands as they pass through. |
| On May 29, 2020, the NYS Courts directed "[j]udges and nonjudicial personnel . . . to make every effort to ensure that a distance of at least six feet is maintained from work colleagues and the public at all times." | On March 17, Amazon implemented a three-foot social distancing policy, and changed this policy to require six feet of social distancing on March 20. Amazon took action against associates—including Mr. Smalls and Mr. |

| New York State Courts' Measure | Amazon's Analogous Measures |
|---|---|
| On the same day, the NYS Courts stated that "[e]mployees must not congregate in locker rooms, break rooms, lunchrooms/cafeterias or other confined areas used by multiple people" and "encouraged [judges and non-judicial personnel] to take their lunch break in open outside areas wherever possible."[14] | Palmer—who failed to adhere to this critical health and safety measure.<br><br>Amazon modified its operations and the layout of JFK8 in several ways to facilitate social distancing. *See supra* ¶¶ 61–70. |
| On or before May 15, 2020, NYS Courts adopted procedures for when a courthouse visitor or court staff member self-identifies as having COVID-19 or having been exposed to COVID-19. | Since March 5, Amazon has instructed all associates feeling sick to stay home, self-monitor, seek assistance from a medical care provider, and report any symptoms or diagnosis to Amazon.<br><br>Amazon has posted signs at entrances directing associates to go home if, among other things, they are experiencing symptoms like coughing or shortness of breath.<br><br>Amazon began contact tracing in February 2020, and, on March 20, Amazon formalized its contact tracing process following confirmation of a case of COVID-19 at JFK8.<br><br>Like New York State, Amazon places associates identified as having close contact with an individual with COVID-19 on paid leave until 14 days after their last contact with the diagnosed individual have elapsed. This COVID-related paid time off does not count against the associates' paid and unpaid time-off accruals. |
| Beginning in mid-May 2020, New York State Courts began COVID-19 testing of uniformed officers serving in court facilities. The New York State Courts had no independent COVID-19 testing capacity, however, and recommended that court personnel make use of | Amazon administers its own COVID-19 testing program, conducting tens of thousands of tests a day across 650 sites—including JFK8. Because Amazon built this testing capacity itself, Amazon added to the total number of tests available—it did not take supply from others. |

---

[14] Declaration of John W. McConnell, Ex. G at 4, *Quirk v. DiFiore*, No. 1:20-cv-5027, ECF No. 24-5 (S.D.N.Y. Aug. 7, 2020).

| New York State Courts' Measure | Amazon's Analogous Measures |
|---|---|
| the testing facilities of New York State, county, and municipal agencies. | Amazon also has a partnership with Grand Rounds to provide telehealth consultations and up-to-the-minute support at no cost, and, in December 2020, Amazon launched a program which connects associates experiencing COVID-19 symptoms with free offsite COVID-19 testing options. |

127.    The OAG's description of the New York State Courts' response to COVID-19 in public courthouses as "comprehensive," "reasonable," and "effective," Quirk Opp. at 2, is equally if not more applicable to Amazon's more thorough, industry-leading response in a safer, private facility.

128.    The OAG's inconsistent position is also clearly illustrated by the OAG's statements with respect to the federal regulations regarding face masks.

129.    In its preliminary assessment of Amazon's response to the COVID-19 pandemic, OAG stated that "29 C.F.R. § 1910.132, specifically applied to the COVID-19 epidemic by the OSHA Guidance, required making available types of PPE required during a COVID-19 outbreak, including sufficient gloves and masks."  April 22 Letter at 10.

130.    When defending the New York State Courts, however, OAG stated that 29 C.F.R. § 1910.132 "only applies when PPE is necessary because of 'hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants,' not to viruses such as COVID-19."  Quirk Opp. at 17 (citation omitted).

**C. Mr. Smalls And Mr. Palmer Repeatedly Violated Amazon's Health And Safety Policies.**

131.    Social distancing has been one of Amazon's critical health and safety policies throughout the COVID-19 pandemic.  As Amazon's policy states, the CDC recognizes social

distancing as a "key precaution[]," and it is "important that the social distancing requirements [Amazon has] put into place . . . be communicated, adhered to, and enforced by everyone without [Amazon's] facilities at all times."

132.   Governor Cuomo has also emphasized the importance of social distancing, stating on April 1, 2020: "How many people have to die before the people ignoring social distancing get that they have a responsibility?  One person sneezes—another person gets intubated.  We have to look out for each other."[15]

133.   The New York Attorney General expressed a similar view when discussing regulations banning group rides to healthcare facilities: "These policies are in place for a reason: to help save lives.  Violating them endangers both patients and the general public[.]"[16]

134.   Amazon clearly communicated its expectations regarding social distancing to associates at JFK8 through multiple means, including at first through direct communications from managers and eventually though posters throughout the facility stating that failure to maintain social distancing "will result in disciplinary action" as well.  Moreover, by March 25, Amazon had implemented multiple process changes that would have made it obvious to any associate the lengths to which Amazon was going to maintain social distance, including suspending exit screening, eliminating in-person stand up meetings, extending breaks, and staggering shifts.  *See supra* ¶¶ 61–63.

135.   Despite full knowledge of the importance of social distancing and Amazon's efforts to facilitate it, JFK8 associates Christian Smalls and Derrick Palmer repeatedly failed to maintain

---

[15] New York Governor Andrew Cuomo (@NYGovCuomo), Twitter (Apr. 1, 2020, 1:07 PM), https://twitter.com/NYGovCuomo/status/1245397408210706434?s=20.

[16] New York State Attorney General Letitia James (@NewYorkStateAG), Twitter (Apr. 6, 2020, 10:48 AM), https://twitter.com/NewYorkStateAG/status/1247174275662036992.

social distancing during the week of March 23, 2020, thereby placing their health and the health of their colleagues at risk.

136.   On March 25, 26, and 27, Mr. Smalls led groups of associates in disrupting production meetings among senior members of JFK8's leadership.  Mr. Smalls and the other associates did not maintain social distancing during these disruptions, as they were gathered in rooms not sufficiently large to accommodate the required six-foot distance between individuals. In response to Mr. Smalls' first two violations of Amazon's social-distancing requirements on March 25 and 26, Mr. Smalls was warned and instructed regarding those requirements.  Following his third violation in three days, Amazon warned Mr. Smalls on March 27 that continued disregard of social-distancing requirements could lead to the termination of his employment.

137.   On March 26, Amazon learned that a JFK8 associate had been diagnosed with COVID-19 and immediately initiated its standard contact-tracing procedure, which it completed the evening of March 27.  Amazon's Loss Prevention team—the group that oversees security of people, products, and information at each site and in Amazon's supply chain—reviewed the infected associate's movements on video in accordance with Amazon's contact-tracing procedures, and determined that ***Mr. Smalls had been within six feet of the infected associate for approximately 46 minutes***.  This significant length of time not only reflects Mr. Smalls' blatant disregard for social distancing, but also clearly placed him at risk of contracting and spreading COVID-19.

138.   On March 28, when Mr. Smalls next came to work, a senior operations manager at JFK8 promptly met with Mr. Smalls and informed him that he had had contact with a fellow associate diagnosed with COVID-19.  Consistent with Amazon's policy, the senior operations manager explained that Mr. Smalls needed to leave the worksite immediately and self-quarantine,

with full pay, until April 7—which was 14 days following Mr. Smalls' last close contact with the infected associate.  The senior operations manager told Mr. Smalls that during this paid quarantine period, he was not allowed back on site.  Mr. Smalls clearly understood the restriction under which he was being placed:  He acknowledged that he understood Amazon's quarantine instructions during his conversation with the senior operations manager on March 28, and he has since confirmed in *multiple* public interviews that he understood he could not return to any part of JFK8.[17]

139.    Two days later, on March 30, Mr. Smalls defied Amazon's clear directive not to return to JFK8 and attended a protest at the worksite.  As Mr. Smalls explained in a public interview, he recognized that he could not "come back to the building because I'm quarantined," but decided that he "didn't give a damn" and returned to JFK8 for the March 30 protest.  Although Mr. Smalls knew that he had possibly contracted COVID-19, Mr. Smalls made the "strategic" decision to time his protest to maximize the number of people who would be in the parking lot— and thus at risk of exposure to COVID-19—because "perception is everything."[18]

140.    Further, Mr. Smalls *again* failed to maintain social distance during the protest despite knowing that he could already be infected with COVID-19.  Mr. Smalls brought himself

---

[17]  *See* Camelot 331, *A Nationwide Walkout For Amazon Got This Man FIRED! FT Chris Smalls*, YouTube (Apr. 24, 2020), https://www.youtube.com/watch?v=LGaavQUc6t8&t=57s (Mr. Smalls: "Now I can't come back to the building because I'm quarantined, but I didn't give a damn."); PIX11 News, *Amazon worker speaks on being fired after leading warehouse walkout*, YouTube (Apr. 1, 2020), https://www.youtube.com/watch?v=P0MGK57JZdI (Interviewer: "But quarantine means you have to stay inside your house." Mr. Smalls:  "Well yeah, quarantine definitely means that . . . .").

[18] Tonetalks, *Fired Amazon Worker Chris Smalls Tells His Story About Walk Out*, YouTube (Apr. 4, 2020), https://www.youtube.com/watch?v=-p4Jx43a4jc ("Everything I did was strategic. Basically I knew that we had lunch at 12:30.  I looked at the weather for Monday – is about 65 degrees.  So I know how Amazon operates.  People like to eat outside when the weather is nice. Perception is everything.  So, whether we had 50 or 100 people, I knew people were gonna be outside.").

within close proximity to—practically in the faces of—other Amazon associates, including Amazon associates who did not join the protest but who were simply exiting the building during their lunch break.  Mr. Smalls' continued and blatant disregard of the quarantine and social-distancing measures necessary to protect the public health—including the well-being of the Amazon associates on whose behalf he claimed to be protesting—cannot be doubted.  In fact, it is documented by publicly available media footage of the protest itself:





141.    Because Mr. Smalls' actions threatened the health and safety of his co-workers, Amazon had no choice but to terminate his employment.  As a senior operations manager at JFK8 explained while informing Mr. Smalls that Amazon terminated his employment:

Amazon has a responsibility to ensure the safety of all associates, leaders, and visitors on our property. . . . Despite clear guidance to remain out of work with pay until April 7, 2020, you came onsite today, March 30, 2020, potentially putting Amazon employees and others at risk.  In addition, on March 27, 2020 you were coached by [senior leaders] to comply with the Social Distancing requirements by remaining 6 FT apart from others at all times. Despite this coaching, and your quarantine status, on March 30, 2020 you repeatedly, intentionally violated Amazon's social distancing requirements, failing to maintain 6FT of distance from others.  At this time, based on your violation of Amazon's Standards of Conduct and behavioral expectations, your employment will end effective immediately.

142.    Like Mr. Smalls, Mr. Palmer repeatedly failed to maintain social distancing while disrupting production meetings among JFK8's senior leadership on March 25, 26, and 27.

143.    In an effort to address Mr. Palmer's multiple social-distancing violations, a senior operations manager at JFK8 spoke with Mr. Palmer on March 27 and reiterated the importance of maintaining social distancing.  But Mr. Palmer ignored Amazon's attempts to emphasize the importance of social distancing and continued to violate Amazon's social-distancing policy during the March 30 protest.

144.    Due to Mr. Palmer's repeated social-distancing violations and disregard for his fellow associates' safety, Amazon issued a warning to Mr. Palmer:

Your health and well being is our top priority.  Amazon has a responsibility to ensure the safety of all associates, leaders, and visitors within the building whether they are on the clock or off the clock.  On 3/25/20, 3/26/20, and 3/27/20, you were given the instruction to social distance and give 6 feet between each person.  On 3/30/30 you came on site and were again provided the guidance to social distance and remain 6 feet from others, you intentionally violated Amazon's social distancing requirements, failing to maintain 6FT of distance from others.  These behaviors are violations of Amazon's Standards of Conduct policy.  "Insubordination or intentional disregard of instructions" is considered a Category 1 violation of the Standards of Conduct.

145.    The facts belie any contention that Amazon retaliated against Mr. Palmer for protesting.  Amazon's treatment of Mr. Palmer is consistent with its treatment of other associates— in fact, Amazon issued final written warnings for violations of the social-distancing policy to at least 12 associates in addition to Mr. Palmer in April and May.  More fundamentally, since

43

Amazon issued the warning to him, Mr. Palmer has protested conditions at Amazon, filed a lawsuit against Amazon seeking to address alleged deficiencies in Amazon's response to the COVID-19 pandemic, and raised concerns on the Voice of the Associate board.  Yet, Amazon has not issued any additional warnings to Mr. Palmer for these activities, all of which were consistent with Amazon's social-distancing policy.  It was Mr. Smalls' and Mr. Palmer's unsafe actions, not any protest activity, that led Amazon to take action against them.

**D.  Smalls And Palmer File Civil Claims, And The U.S. District Court For The Eastern District Of New York Dismisses Palmer's Claims.**

146.    Three months after New York declared a COVID-19-related state of emergency on March 7, 2020,[19] Palmer and several co-workers and family members brought suit against Amazon in the United States District Court for the Eastern District of New York.  *Palmer v. Amazon.com, Inc.*, No. 20-cv-2468 (BMC), --- F. Supp. 3d ---, 2020 WL 6388599, at *2 (E.D.N.Y. Nov. 2, 2020).  The *Palmer* plaintiffs challenged Amazon's health and safety policies, contending that they fell short of state and federal guidance, and asserted claims for, *inter alia*, public nuisance and breach of the duty to protect the health and safety of employees under New York Labor Law ("NYLL") § 200.  *Id.*

147.    On July 9, the OAG appeared in Palmer's litigation against Amazon and requested leave to file an *amicus curiae* brief in support of the plaintiffs.  The district court deemed the OAG's submission to be an *amicus curiae* brief.

148.    The district court dismissed all of the *Palmer* plaintiffs' claims.  The court held that the primary-jurisdiction doctrine applies to plaintiffs' public-nuisance and Section 200 claims because OSHA has primary jurisdiction over regulations of health and safety in the

---

[19]  *See* N.Y. Exec. Order No. 202 (Mar. 7, 2020), https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york.

workplace. *Palmer*, 2020 WL 6388599, at *4–7. The court noted that "Plaintiffs' claims . . . turn on factual issues requiring both technical and policy expertise" and "go to the heart of OSHA's expertise and discretion." *Id.* at *6. The court concluded that OSHA—not the courts—should evaluate the *Palmer* plaintiffs' allegations that Amazon's workplace policies at JFK8 do not "adequately" protect worker safety. *Id.* (emphasis omitted). The court accordingly dismissed plaintiffs' public-nuisance and Section 200 claims pursuant to the primary-jurisdiction doctrine to allow plaintiffs to "determine whether to seek relief through the appropriate administrative and regulatory framework." *Id.* at *7. (The *Palmer* plaintiffs have not pursued any relief from OSHA.)

149.   The court further held that "[e]ven if [it] did not defer to OSHA's primary jurisdiction, plaintiffs' public nuisance and NYLL § 200 claims would not survive Amazon's motion to dismiss." *Palmer*, 2020 WL 6388599, at *7. The court concluded that "[b]oth plaintiffs' concern and their risk present a difference in degree, not kind, from the injury suffered by the public at large and thus is not actionable in a private action for public nuisance." *Id.* at *8. The court also held that plaintiffs' Section 200 claim is preempted by New York's Workers' Compensation Law. *Id.* at *10-11. The *Palmer* plaintiffs have appealed that decision to the United States Court of Appeals for the Second Circuit. *See Palmer v. Amazon.com, Inc.*, No. 20-3989 (2d Cir.).

150.   Soon after the district court dismissed Mr. Palmer's complaint, Mr. Smalls brought suit against Amazon, alleging that (a) he was exposed to a co-worker with COVID-19, (b) Amazon "direct[ed] him to leave the premises" and to "quarantine[] with pay," (c) he ignored this order and "return[ed] to the fulfillment center" to "lead a demonstration," and (d) Amazon promptly terminated his employment, explaining that he "violat[ed] its quarantine order and thereby

jeopardiz[ed] the health and safety of other employees."  Ex. 1 (Compl. ¶¶ 8, 9, 13, 16, 27, 29, *Smalls v. Amazon, Inc.*, No. 1:20-cv-5492 (E.D.N.Y. Nov. 12, 2020) ("*Smalls* Compl.")).

151.    Mr. Smalls claimed that his termination was retaliatory and discriminatory in violation of 42 U.S.C. § 1981 and the New York State and New York City Human Rights Laws. Mr. Smalls also sought to represent a class of non-management "line workers," who, he claimed, were provided with less-effective COVID-19 safety measures than management employees based on their race.

152.    Mr. Smalls' own allegations, however, established why he lost his job: he was exposed to a co-worker with COVID-19; he was "direct[ed]" to "leave the premises" and to quarantine (and was paid to do so); he ignored this order, returning to the worksite to lead a demonstration, thereby putting the health and safety of his co-workers at risk; and Amazon fired him two hours later, explaining that his violation of the quarantine order was the reason.  Ex. 1 (*Smalls* Compl. ¶¶ 9, 13, 16, 27, 29).  These allegations demonstrate that Mr. Smalls was fired not because of a discriminatory motive on the part of Amazon, but because of his own actions.

153.    More fundamentally, the allegations in Mr. Smalls' complaint are subject to the primary jurisdiction of OSHA or the NLRB, and are preempted by the National Labor Relations Act.  Mr. Smalls also offered no factual allegations to support his false, conclusory assertion that Amazon's safety policies applied differently to management, or that any difference in treatment was related to race, as opposed to job duties.

154.    On December 28, 2020, Amazon filed a pre-motion letter, seeking leave to file a motion to dismiss Mr. Smalls' lawsuit.  Pre-Motion Letter, *Smalls v. Amazon.com Servs. LLC*, No. 1:20-cv-5492, ECF No. 15 (E.D.N.Y. Dec. 28, 2020).

### E. The OAG Launched An Investigation Into Matters Governed By Federal Law And Within The Jurisdiction Of Federal Agencies.

155.    On March 30, 2020, shortly after Amazon terminated Mr. Smalls' employment for his repeated, blatant disregard of policies designed to protect the health of his co-workers, the New York Attorney General posted a tweet and issued a statement criticizing Amazon's actions with respect to Mr. Smalls and "calling on the *National Labor Relations Board* to investigate."[20]

156.    On April 3, Amazon sent the OAG a letter with an extensive description of the company's health and safety measures and its reasons for terminating Mr. Smalls' employment, and provided the following excerpt from the New York City Sheriff's Office's report of the inspection to the Mayor's Office:

---

[20] New York State Office of the Attorney General, *AG James' Statement on Firing of Amazon Worker Who Organized Walkout* (Mar. 30, 2020), https://ag.ny.gov/press-release/2020/ag-james-statement-firing-amazon-worker-who-organized-walkout (emphasis added); New York State Attorney General Letitia James (@NewYorkStateAG), Twitter, (Mar. 30, 2020, 10:15 PM), https://twitter.com/NewYorkStateAG/status/1244810606613577728 (emphasis added).

Thank you for allowing us access to inspect your facility yesterday. I wrote a very favorable report back to the Mayor's Office, which is overseeing the complaints regarding the violations of the executive orders and social distancing policies. I pasted my report back to the Mayor's Office below so you can see it.

Unfortunately, with that said the Mayor's Office is still continuing to receive numerous complaints about your facility. Although, after seeing your facility I do believe that these complaints are completely baseless, we do still have an obligation to investigate them. Would it be possible for us to come by the facility again two or three more times this week just to verify that nothing has changed within the facility? I know that this is inconvenient, and you have no legal obligation to grant this request, but we can make it very quick and non-intrusive. I can come with just one other officer so we don't need to make a big spectacle again.

Please advise if this will be permissible, and what days and times will work for you or your staff. I generally work mid-afternoons through the night shift.

Thank you very much,

Lieutenant Derek A. Skuzenski, PhD.
Vice President
NYC Deputy Sheriffs' Association
www.NYCSheriffsPBA.org

> Deputy Sheriffs led by Lieutenant Skuzenski conducted an inspection at location based on the received complaints. They spoke with Mr. Geoff Gilbert-Differ, the Regional Loss Prevention Manager who stated that he was not surprised that they had received complaints because they were currently managing an employee strike. Sheriff's Lieutenant Skuzenski requested permission for his team to enter and inspect the approximately 1,500,000 square foot facility. Mr. Gilbert-Differ voluntarily granted the request, and provided deputies with a tour of the facility. The facility appeared to go above and beyond the current compliance requirements. Deputies observed the facility's temperature screening procedure which is required to enter the facility. In addition, at the entrance way there are numerous legible signs explaining the six-foot social distancing policy, and there are taped indicators on the floor to enforce this policy. Deputies were given a tour of the work areas, which had every other desk space shut down so that no employees were within the vicinity of any other employee. Deputies were also given a tour of the break room/ lunch room which also appeared to be in strict compliance. The loss prevention manager secured one chair to each table, so that it would be impossible for more than one employee to be at table at once. Mr. Gilbert-Differ also explained that they had begun staggering employee shifts to both minimize the amount of staff in the facility at once, and to reduce the amount of staff that was entering and exiting the building at once to further promote social distancing.

157.    On April 22—less than a month after launching its investigation and before the OAG asked Amazon to make a single employee available for an interview—the OAG took the highly unusual step of sending Amazon a letter "express[ing] certain preliminary assessments and, pending further investigation, request[ing] certain immediate relief." April 22 Letter at 1. The letter specifically cited federal law under the jurisdiction of federal OSHA, including "both specific OSHA safety standards applied specifically to this crisis by the OSHA Guidance, and the OSHA general duty clause." *Id.* at 10.

158.    With respect to Mr. Smalls, the April 22 letter made clear that Mr. Smalls' alleged protected activity fell within the scope of the NLRA because he "led coworkers in refusing to work

under such unlawfully unsafe conditions by engaging in a walkout to protest these conditions on March 30," and "Amazon discharged Mr. Smalls . . . after he organized and participated in a protest of [working] conditions."  April 22 Letter at 9, 12.  The OAG demanded reinstatement of Mr. Smalls "regardless of what conclusion is ultimately reached" as to the merits of his discharge.  *Id.* at 13, n.23.

159.    On April 27, NPR reported that it had obtained a copy of the OAG's April 22 letter to Amazon.  NPR's report quotes from the April 22 letter and describes its contents.[21]

160.    Amazon did not provide a copy of the OAG's April 22 letter to NPR.

161.    Although the OAG denies providing a copy of its April 22 letter to NPR, the Deputy Labor Bureau Chief who led the OAG's investigation of Amazon and who co-signed the April 22 letter retweeted the NPR article on April 27—the day NPR published the article—noting "Letter quoted in article."[22]

162.    On May 27, 2020, the OAG, through its Deputy Labor Bureau Chief, executed a common interest agreement with Towards Justice and Make the Road New York ("Make the Road"), lawyers for Mr. Palmer, on behalf of themselves and their clients.  The common interest agreement expressly contemplated that the parties would share privileged or confidential material and use that material "in discussion of facts and legal principles relevant to (a) the Investigation, and/or (b) the Lawsuit concerning Amazon's compliance with legal requirements relevant to

---

[21] Alina Selyukh, *Amazon Warehouse Safety 'Inadequate,' N.Y. Attorney General's Office Says*, NPR (Apr. 27, 2020), https://www.npr.org/2020/04/27/846438983/amazon-warehouse-safety-inadequate-n-y-attorney-general-s-office-says.

[22] On April 28, the same OAG Deputy Bureau Chief retweeted a Bloomberg article reporting on the OAG's investigation of Amazon.  *See* Erik Larson, *Amazon's Pandemic Labor Practices Being Probed by New York*, BLOOMBERG (Apr. 27, 2020), https://www.bloomberg.com/news/articles/2020-04-28/amazon-s-pandemic-labor-practices-being-probed-by-new-york.

protecting workers from COVID-19 and preventing spread of the virus to the public, and to the

extent appropriate, development by the Parties of potential future litigation strategies."

163.    On June 3, Towards Justice and Make the Road filed a lawsuit against Amazon on

behalf of multiple associates employed at JFK8 and their families, including Mr. Palmer.

164.    On July 9, the OAG requested leave to file an *amicus curiae* brief in the *Palmer*

litigation in support of the plaintiffs.  The OAG did not disclose to the court that it had executed

the common interest agreement with Towards Justice and Make the Road, nor has it withdrawn

from the agreement.

**F.  The OAG Has Made Overreaching Demands Of Amazon In Order To Discontinue Its Investigation And Has Threatened To Enforce Them Imminently.**

165.    Now, the OAG has threatened to sue Amazon unless the company complies with a

series of unreasonable demands.  These demands—made without legal or factual justification—

show that OAG's threat to enforce the New York Labor Law against Amazon is real and imminent,

and demonstrate why Amazon must seek immediate relief from this Court.

166.    The OAG has made these threats and demands even though federal authorities have

primary jurisdiction to regulate workplace safety, and federal law preempts efforts to use state law

to regulate Amazon's health and safety responses to COVID-19 and allegations of retaliation for

NLRA-protected activity.  The OAG's actions are not only unauthorized, but also unreasonable in

light of the factual record demonstrating that Amazon's actions complied with and exceeded

federal standards.

167.    In its preliminary assessment, the OAG demanded that Amazon take certain steps

"pending ultimate resolution of [its] investigation," noting that, "[d]epending on the outcome of

[its] investigation, additional remedies may be sought later."  April 22 Letter at 13 & n.23.

168.    The OAG's demand that Amazon "remed[y]" certain alleged "health and safety issues" usurps the primary jurisdiction of federal authorities to regulate workplace safety issues under the OSH Act and ignores the preemption of state law.  April 22 Letter at 13.

169.    The OAG's demand also ignores the New York City Sheriff's Office's conclusion that complaints about those issues were completely "baseless," as well as Amazon's record of industry-leading safety measures, well exceeding the New York State Courts' efforts that the OAG described as "comprehensive," "reasonable, effective, and necessary in minimizing exposure." Quirk Opp. at 2.

170.    Similarly, the OAG's demand that Amazon retain a "health and safety consultant" to "advise Amazon" and "monitor Amazon's implementation" of health and safety measures does not address the fact that Amazon already retains and consults with top health and safety experts and bases its health and safety programs on their advice.  April 22 Letter at 14.

171.    The OAG also demanded reinstatement for Mr. Smalls "regardless of what conclusion is ultimately reached" through its investigation—thus, the OAG demanded reinstatement of Mr. Smalls *even if* the evidence shows—as it does—that Mr. Smalls' conduct actively *threatened* the health and safety of his coworkers.  April 22 Letter at 13 n.23.

172.    Despite failing to identify a legal or factual basis for its claims against Amazon after eight months of investigation, the OAG has not only reasserted the demands in its preliminary assessment, but also has also demanded additional unjustified concessions from Amazon.

173.    The OAG's new demands, like those in its preliminary assessment, are unwarranted and untethered to the factual record or the law.  These unjustified demands include payments to Mr. Smalls and Mr. Palmer for alleged "emotional distress," disgorgement of profits, and subsidies for expanded bus service by MTA.  Claims of retaliation against workers who protest working

conditions, however, fall within the primary jurisdiction of federal regulators and are preempted by federal law.  In addition, even under state law, the OAG has no power to file employment claims on behalf of individuals; indeed, Mr. Smalls and Mr. Palmer already have retained counsel and filed their own employment claims.

174.    The OAG has threatened to sue Amazon imminently if Amazon does not acquiesce to the OAG's demands.

## G.  The OAG Is Impermissibly Intruding On Federal Jurisdiction.

175.    The OAG lacks legal authority to regulate workplace safety responses to COVID-19 or claims of retaliation against workers who protest working conditions; such regulatory authority is preempted by federal law and falls within the primary and exclusive jurisdiction of federal regulators.

### The OAG Has No Legal Basis To Regulate Workplace Health And Safety

176.    The OAG's ongoing unsubstantiated effort to regulate Amazon's health-and-safety response to the COVID-19 pandemic and to force the company to adopt the OAG's preferred workplace policies is preempted by federal law.

177.    The OSH Act "'unquestionably' pre-empts" any state attempt to "establish[ ] an occupational health and safety standard on an issue for which OSHA has already promulgated a standard."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 97 (1992) (plurality); *see* 29 U.S.C. § 667(a)–(b).  Under the Act, states may "assume responsibility" for "occupational safety and health standards" only by submitting a plan to the Secretary of Labor.  29 U.S.C. § 667(b). Absent such a plan, OSHA retains exclusive jurisdiction to enforce the standards that it promulgates.

178.     New York has deliberately chosen *not* to exercise the right to develop and enforce occupational health and safety standards for private employers.  Although New York submitted a plan that received the Secretary's approval in 1973, New York withdrew that plan two years later.  *Palmer*, 2020 WL 6388599, at *9 (citing *Irwin v. St. Joseph's Intercommunity Hosp.*, 236 A.D.2d 123, 127 (N.Y. App. Div. 4th Dep't 1997)).  Since that time, New York has expressly *disclaimed* authority to promulgate standards in areas within OSHA's jurisdiction.  *See* N.Y. Lab. Law § 27(1) ("[A] safety or health standard promulgated under this section shall apply only to employees not covered by a federal occupational safety or health standard[.]").  And the OAG has agreed that the OSH Act's "statutory scheme envisions that the public rights created by the Act are to be protected by the Secretary [of Labor] and that enforcement of the Act is the sole responsibility of the Secretary."  Quirk Opp. at 17 (quoting *Jacobsen v. N.Y. City Health & Hosps. Corp.*, No. 12-cv-7460, 2013 WL 4565037, at *7 (S.D.N.Y. Aug. 28, 2013)).  Accordingly, OSHA retains exclusive jurisdiction to enforce workplace safety standards for private employers like Amazon.

179.     While the OSH Act does not preclude New York from "asserting jurisdiction . . . over any occupational safety or health issue" in the *absence* of an applicable federal standard, 29 U.S.C. § 667(a), OSHA has made clear that "existing [federal] standards for, *inter alia*, personal protective equipment, general environmental controls, and toxic and hazardous substances, as well as employers' obligations under the OSH Act's general duty clause," govern employers' operations in response to COVID-19.  *Palmer*, 2020 WL 6388599, at *5; *see* Dep't of Labor Br. 21–23, *In re AFL-CIO*, No. 20-1158 (D.C. Cir. May 29, 2020); *see also* 29 C.F.R. § 1910.132 (PPE); *id.* § 1910.134 (airborne contaminants); *id.* § 1910.141 (sanitation).  This approach reflects OSHA's "reasonabl[e] determin[ation] that . . . it has existing regulatory tools at its disposal to ensure that employers are maintaining hazard-free work environments."  *Palmer*, 2020 WL

6388599, at *5 (quotation marks omitted); *see also In re AFL-CIO*, No. 20-1158, 2020 WL 3125324, at *1 (D.C. Cir. June 11, 2020) (per curiam) ("In light of the unprecedented nature of the COVID-19 pandemic, as well as the regulatory tools that the OSHA has at its disposal to ensure that employers are maintaining hazard-free work environments, the OSHA reasonably determined that an [emergency temporary standard] is not necessary at this time.") (citation omitted).

180.    The OAG itself agrees that the alleged health and safety issues at JFK8 are governed by existing federal laws and standards enforced by OSHA.  *See* April 22 Letter at 10 (alleging Amazon's conduct "would likely violate both specific OSHA safety standards applied specifically to this crisis by the OSHA Guidance, and the OSHA general duty clause"); *id.* ("[C]arrying on business in an inadequately sanitized and disinfected workplace would violate 29 C.F.R. § 1910.22 and § 1910.141[.]"); *id.* ("29 C.F.R. § 1910.132, specifically applied to the COVID-19 epidemic by the OSHA Guidance, required making available types of PPE required during a COVID-19 outbreak, including sufficient gloves and masks."); *id.* ("To the extent those specific standards did not apply, . . . most of the hazards of which Mr. Smalls complained, including failure to sanitize the facility, failure to inform employees of their exposure to COVID-19, and failure to provide adequate PPE, were 'recognized' hazards under OSHA's general duty clause.").

181.    As the *Palmer* court observed, "OSHA continues to use its enforcement mechanisms during the pandemic." *Palmer*, 2020 WL 6388599, at *6.  By January 14, 2021, OSHA had opened approximately 1,500 federal inspections as part of its response to COVID-19 and issued over 300 citations with total initial penalties of $4,034,288 for violations of existing

standards.[23]  In addition to this enforcement activity, OSHA has issued "extensive guidance, often in conjunction with the CDC," concerning COVID-19 workplace safety.[24]  This federal regulatory activity reflects OSHA's policy judgment that guidance pronouncements allow the agency "to speak more specifically to particular types of workplaces and controls than would be practicable in a generally applicable rule."[25]

182.    Further, President Biden already has issued an Executive Order directing OSHA to take several additional actions regarding COVID-19, including issuing new COVID-19 safety guidance to employers by February 4, 2021.  *See Executive Order on Protecting Worker Health and Safety*, White House § 2(a) (Jan. 21, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/executive-order-protecting-worker-health-and-safety/.

183.    Pursuant to this Executive Order, on January 29, 2021, OSHA issued guidance "intended to . . . help [employers] determine appropriate control measures to implement."[26]  This guidance "contains . . . descriptions of mandatory safety and health standards" as well as "recommendations [that] are advisory in nature, informational in content, and are intended to assist employers in providing a safe and healthful workplace."

---

[23] *See* OSHA, *COVID-19 Response Summary* (last visited Feb. 10, 2021), https://www.osha.gov/enforcement/covid-19-data#fed_inspections_open;  OSHA, *Inspections with COVID-related Citations* (last updated Jan. 14, 2021), https://www.osha.gov/enforcement/covid-19-data/inspections-covid-related-citations.

[24] Testimony of Loren E. Sweatt, Principal Assistant Deputy Secretary, OSHA, before Subcommittee on Workforce Protections, Committee on Education and Labor, U.S. House of Representatives (May 28, 2020), https://www.osha.gov/news/testimonies/05282020.

[25] *Id.*

[26] OSHA, *Protecting Workers:  Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace* (Jan. 29, 2021), https://www.osha.gov/coronavirus/safework.

184.    OSHA's January 29 guidance makes clear that "[a]ll of OSHA's standards that apply to protecting workers from infection remain in place," including "requirements for PPE, respiratory protection, sanitation, protection from bloodborne pathogens, and OSHA's requirements for employee access to medical and exposure records."  In addition, "employers still are required under the General Duty Clause, Section 5(a)(1) of the OSH Act, to provide a safe and healthful workplace that is free from recognized hazards that can cause serious physical harm or death."[27]  The January 29 OSHA guidance therefore demonstrates that OSHA remains active at the federal level in policing employers' workplace safety responses to the COVID-19 pandemic.

185.    President Biden's Executive Order also directs OSHA to "consider whether any emergency temporary standards on COVID-19, including with respect to masks in the workplace, are necessary," and if it determines such standards are necessary, to issue emergency temporary standards by March 15, 2021, *Executive Order on Protecting Worker Health and Safety*, *supra*, § 2(b), thus raising the prospect of additional federal standards governing employers' operations in response to COVID-19.

186.    Thus, the OSH Act preempts the OAG's attempt to enforce OSHA standards or its own workplace safety preferences with respect to Amazon's response to the COVID-19 pandemic. As the *Palmer* court noted, "New York . . . cannot enforce state occupational safety and health standards for issues covered by a federal standard."  2020 WL 6388599, at *9.

187.    In fact, the *Palmer* court found that the very concessions the OAG is attempting to coerce from Amazon are firmly within the primary jurisdiction of OSHA:

---

[27] *Id.* (citations omitted).

| Relief Demanded by OAG<br><br>(April 22 Letter at 13–14) | Relief Requested by *Palmer* Plaintiffs and Found to Be Within OSHA's Primary Jurisdiction<br><br>(*Palmer*, 2020 WL 6388599, at *3–4, *7) |
|---|---|
| Provide employees with adequate hand sanitizer and other cleaning agents and adequate time to engage in regular and frequent handwashing. | Continue suspending rate requirements and refrain from counting handwashing and bathroom breaks against TOT requirements, and communicate these policies to workers.<br><br>Provide workers with adequate time and tools to clean and disinfect their workstations. |
| Whenever necessary, employee stations must be re-configured and other necessary changes must be made in Amazon facilities to enable and facilitate employees' actual compliance with the social distancing six-foot rule. | Provide access to air-conditioned breakrooms where workers can maintain social distancing. |
| Provide employees with accurate and complete information concerning their possible exposure to COVID-19 in the workplace (while maintaining confidentiality as to particular infected employees' identities), as set forth in the CDC Guidance. | Conform [Amazon's contact tracing] efforts to New York and CDC guidance for contact tracing, such as interviewing the infected individual about others with whom they have been in touch, accounting for their activities in the 48 hours before diagnosis or onset of symptoms, and following up with all identified contacts of the infected individual to inform them of their exposure and inquire if they are experiencing symptoms. |

188.    The OAG attempts to predicate its right to invade OSHA's jurisdiction on Section 200 of the New York Labor Law, but that attempt fails on multiple levels.

189.    First, even if the OAG's regulation of Amazon were not preempted by federal law, the OAG's authority under Section 200 is limited to "institut[ing] a proceeding to . . . enjoin further work in or occupancy of [an] area" after the Labor Commissioner "finds that [the] area . . . is in a dangerous condition." N.Y. Lab. Law § 200(2)–(3). The Labor Commissioner has made no such determination, nor could she based on the facts. Moreover, to the extent the OAG is attempting to leverage Section 200 to recover damages arising from injuries supposedly suffered by associates

at JFK8, or to impose injunctive relief, the New York's Workers' Compensation Law bars such claims. *Palmer*, 2020 WL 6388599, at *11 ("the workers' compensation scheme and the remedies available under it provide the exclusive remedy for employee injuries"); *see also* N.Y. Workers Comp. Law § 11. Accordingly, the OAG cannot seek *any* relief against Amazon under Section 200, much less sweeping changes to Amazon's policies and procedures, such as how Amazon measures productivity, that have little to no bearing on any alleged "dangerous condition."

190.    There is also no "dangerous condition" at JFK8 that could even conceivably trigger Section 200. Amazon has provided the OAG with substantial, objective data showing that Amazon has adopted and implemented extensive and effective health and safety measures. For instance, multiple inspections by the New York City Sheriff's Office found that JFK8 "appeared to go above and beyond the current compliance requirements." And only 1.15% of Amazon's New York front-line employees have tested positive or been presumed positive for COVID-19—a rate that is 50% *lower* than the rate for New York's general population. There is thus no support for the claim that Amazon operates JFK8 in a "dangerous condition."

191.    Relatedly, the OAG cannot circumvent the primary and exclusive jurisdiction of OSHA by converting federal agency guidance (as incorporated into state guidance) into legally binding requirements. This would violate the Due Process Clause's guarantee of fair notice, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), and the related requirements of the federal and state administrative procedure acts, *see* 5 U.S.C. § 553; N.Y. A.P.A. Law § 202.

192.    In New York, guidance documents are just that—they "have no legal effect but are merely explanatory." N.Y. A.P.A. Law § 102(2)(b)(iv); *cf. UCP-Bayview Nursing Home v. Novello*, 2 A.D.3d 643, 645 (2d App. Div. 2003) (Department of Health's "explanatory statement" "has no legal effect standing alone"). To the extent that New York guidance incorporates *federal*

guidance, the CDC's COVID-19 guidance documents are "not binding," *United States v. Wragg*, No. 15-cr-398, 2020 WL 4015204, at *8 n.12 (E.D. Pa. July 16, 2020), and OSHA's COVID-19 guidance, on its face, contains "recommendations [that] are advisory in nature" and "creates no new legal obligations," OSHA, *Guidance on Preparing Workplaces for COVID-19*, https://www.osha.gov/Publications/OSHA3990.pdf; *see also A.S.M. v. Warden, Stewart Cty. Detention Ctr.*, No. 7:20-cv-62, 2020 WL 2988307, at *9 (M.D. Ga. June 3, 2020) ("Abundant evidence exists that the CDC did not intend to bind facilities by its Guidance."); *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) ("Policy statements are binding on neither the public nor the agency." (quotation marks omitted)).

193.    For these reasons, the OAG lacks any legal basis to continue its investigation into Amazon's response to the COVID-19 pandemic, to attempt to force the company to adopt the OAG's preferred workplace policies or to initiate enforcement action against Amazon.

### *The OAG Has No Legal Basis To Regulate The Alleged Termination Of Employees For Organizing Activity*

194.    The OAG also lacks any legal basis to continue investigating Amazon for seeking concessions to address, or initiating enforcement action with respect to, the claim that Amazon terminated Mr. Smalls or issued a final warning to Mr. Palmer for organizing and participating in protests regarding working conditions at JFK8.

195.    Under the United States Supreme Court's *Garmon* doctrine, the NLRA preempts state law concerning activity that the Act "protects, prohibits, or *arguably* protects or prohibits." *Ass'n of Car Wash Owners Inc. v. City of N.Y.*, 911 F.3d 74, 81 (2d Cir. 2018) (quotation marks omitted; emphasis added).  Indeed, "[i]t is essential to the administration of the [NLRA]" that "determinations" whether a "particular activity" is governed by the NLRA "be left in the first instance to the National Labor Relations Board." *San Diego Bldg. Trades Council v. Garmon*, 359

U.S. 236, 244–45 (1959).  Any "uncertainty" about the NLRA's application is for the NLRB to resolve.  *Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 101 (2d Cir. 2006).

196.    Only the NLRB, therefore, can address the OAG's allegation that Amazon "terminate[d] an employee" for "publicly protest[ing] the lack of precautions that [the company] was taking to protect [him] from COVID-19."  That is a quintessential NLRA claim, as evidenced by the fact that the New York Attorney General "call[ed] on the *National Labor Relations Board* to investigate" Smalls' termination.[28]

197.    The NLRB has made abundantly clear that the NLRA prohibits retaliation against employees who engage in concerted activity, such as protesting, regarding their employer's efforts to address COVID-19.  For example, "after a group of employees protested . . . [an] alleged failure to provide personal protective equipment (PPE), such as gloves, masks and hand sanitizer, and to enforce social distancing guidelines," the NLRB directed its Regional Office "to issue complaint absent settlement alleging that the Employer violated Section 8(a)(1) of the Act by unlawfully discharging the employee who led protected concerted efforts to secure PPE and to enforce social distancing."  *See* Peter B. Robb, General Counsel, Nat'l Labor Relations Bd., *Summaries of Advice Merit Determinations Related to Coronavirus Disease 2019 Issues* at 2 (Sept. 18, 2020).

198.    In fact, the NLRB already exercised its jurisdiction over claims by a former JFK8 associate and a current DBK1 associate that Amazon retaliated against them for engaging in protected concerted activity.  In the case of the former JFK8 associate, his claim arose from his participation in the same April 6 protest as Mr. Palmer.

---

[28] *AG James' Statement on Firing of Amazon Worker Who Organized Walkout*, *supra*, n.20 (emphasis added).

199. Because the NLRA deprives the OAG of jurisdiction over claims of retaliation based on Mr. Smalls' or Mr. Palmer's participation in protests at JFK8, the OAG has no lawful basis to continue investigating or to prosecute these claims.

200. Beyond federal preemption, New York Labor Law Section 740, which governs claims of retaliation, does not even provide for government enforcement of its provisions, but rather provides that "[a]n *employee* who has been the subject of a retaliatory personnel action in violation of this section may institute a civil action." N.Y. Lab. Law § 740(4)(a) (emphasis added).

201. Similarly, New York Labor Law Section 215, another anti-retaliation statute, authorizes the commissioner of the New York Department of Labor to investigate, and, if appropriate, assess penalties and order all appropriate relief. Section 215 also permits an employee to bring a civil action for alleged violations of this provision. Section 215 does not provide for enforcement of the provision by the OAG.

## FIRST CLAIM FOR RELIEF

(Declaratory Relief – Federal Preemption and Primary Jurisdiction)

202. Plaintiff repeats and re-alleges the foregoing paragraphs.

203. The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land." U.S. Const. art VI.

204. The OSH Act preempts any attempt by the OAG to exercise regulatory authority over a private employer's health-and-safety response to COVID-19. The exercise of such authority, in the absence of an approved state standard, impermissibly intrudes on OSHA's exclusive jurisdiction.

205. Even if not preempted by the OSH Act, the OAG's attempt to exercise regulatory authority over a private employer's health-and-safety response to COVID-19 goes to the heart of

OSHA's expertise and discretion and thus impermissibly seeks to regulate an area over which OSHA has primary jurisdiction.

206.     Further, New York's Workers' Compensation Law—which provides that workers' compensation benefits are the sole and exclusive remedy of an employee against his employer for injuries sustained in the course of employment—bars the OAG's attempt to seek monetary damages or injunctive relief based on alleged past harm to Amazon associates.

207.     The NLRA preempts the OAG from exercising regulatory authority over a claim of retaliation based on an employee's protest of working conditions.  Such regulatory authority falls within the exclusive jurisdiction of the NLRB.

208.     New York Labor Law Sections 215 and 740 create a private, not public, right of action and therefore do not vest the OAG with authority to press a claim of retaliation on behalf of an individual employee.

209.     As a result, the OAG lacks legal authority to regulate workplace safety responses to COVID-19 or claims of retaliation against workers who protest working conditions.

210.     Amazon has been, and will be, irreparably injured by the OAG's refusal to comply with federal law.

211.     The requested declaratory relief will prevent further injuries caused by the OAG's violation of federal law.

## SECOND CLAIM FOR RELIEF

(Injunctive Relief – Federal Preemption and Primary Jurisdiction)

212.     Plaintiff repeats and re-alleges the foregoing paragraphs.

213.     The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land."  U.S. Const. art VI.

214.    The OSH Act preempts any attempt by the OAG to exercise regulatory authority over a private employer's health-and-safety response to COVID-19.  The exercise of such authority, in the absence of an approved state standard, impermissibly intrudes on OSHA's exclusive jurisdiction.

215.    Even if not preempted by the OSH Act, the OAG's attempt to exercise regulatory authority over a private employer's health-and-safety response to COVID-19 goes to the heart of OSHA's expertise and discretion and thus impermissibly seeks to regulate an area over which OSHA has primary jurisdiction.

216.    Further, New York's Workers' Compensation Law—which provides that workers' compensation benefits are the sole and exclusive remedy of an employee against his employer for injuries sustained in the course of employment—bars the OAG's attempt to seek monetary damages or injunctive relief based on alleged past harm to Amazon associates.

217.    The NLRA preempts the OAG from exercising regulatory authority over a claim of retaliation based on an employee's protest of working conditions.  Such regulatory authority falls within the exclusive jurisdiction of the NLRB.

218.    New York Labor Law Sections 215 and 740 create a private, not public, right of action and therefore do not vest the OAG with authority to press a claim of retaliation on behalf of an individual employee.

219.    As a result, the OAG lacks legal authority to regulate workplace safety responses to COVID-19 or claims of retaliation against workers who protest working conditions.

220.    Amazon has been, and will be, irreparably injured by the OAG's refusal to comply with federal law.

221.    The requested injunctive relief will prevent further injuries caused by the OAG's violation of federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully seeks the following relief:

1.    A declaration that defendant lacks authority to regulate (1) workplace safety responses to COVID-19 and (2) claims of retaliation against workers who protest working conditions.

2.    Injunctive relief preventing defendant, acting in her official capacity, from causing the OAG to purport to exercise regulatory authority over (1) workplace safety responses to COVID-19 and (2) claims of retaliation against workers who protest working conditions.

3.    Any and all such relief as the Court may deem appropriate.

Dated:  February 12, 2021

   /s/ Zainab Ahmad_____
Zainab Ahmad

Zainab Ahmad
Mylan L. Denerstein
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel:   (212) 351-4000
zahmad@gibsondunn.com
mdenerstein@gibsondunn.com

Jason C. Schwartz (*pro hac vice forthcoming*)
Lucas C. Townsend (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington D.C. 20036-5306
Tel:   (202) 955-8244
jschwartz@gibsondunn.com
ltownsend@gibsondunn.com

*Counsel for Plaintiff Amazon.com, Inc.*